The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner and upon the briefs and argument of counsel. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between the Plaintiff and the defendant-employer.
3. The defendant-employer is self-insured, with GAB Business Services serving as the servicing agent.
4. Plaintiff's average weekly wage was sufficient to generate the maximum compensation rate as of 1993.
5. Plaintiff is alleging an occupational disease that occurred on or about June of 1993, resulting from stress on the job.
6. The defendant-employer has denied liability, and the issue to be determined by the Commission is whether Plaintiff in fact suffers from an occupational disease.
* * * * * * * * * * *
Based upon all of the competent evidence in the record, the Full Commission rejects the findings made by the Deputy Commissioner and makes the following:
FINDINGS OF FACT
1. Plaintiff is a 56-year-old-male who worked at American Studios for nine years as Vice President of Production. Plaintiff`s depression was caused by stress as the result of being overworked, understaffed, changes in policy, a change in the make up of management, not getting a raise and not being able to take a vacation, all of which took place over a concentrated period of time.
2. Plaintiff worked as the Vice President of Production of the photo lab at American Studios from 1985 until 1994. As Vice President, it was his job to service the film for customers while keeping the costs of production down. American Studios is a photo lab that services orders from one customer, Wal-Mart. Until May 1993, plaintiff's work normally required him to work 40-60 hours per week, depending on the season. His job normally required him to produce photos and return them to the customers in a standard three week turn around.
3. In May 1993, due to a bad first quarter, defendant's Executive Committee decided to compress the production turn around time for plaintiff's department from three weeks to two weeks. As a result, plaintiff then had to work 15-16 hours per day. The workload for his department increased 40-43%, which required plaintiff to work six and seven days per week. Employee vacations were canceled because of the increased need for production. As a result, the turnover rate in his department rose from an average of 6-10% to a new average of 60-70%. At the same time, new equipment was bought for the lab which did not work properly. Under new management, defendant required plaintiff to supervise all three shifts at work, on a rotation basis. On some days, plaintiff was required to report to work at 4:00 a.m., during the third shift, and work until 6:00 or 7:00 p.m. Plaintiff was unable to adjust to the increased pressures which were then imposed on him.
4. In June 1993, the defendant-employer began another new advertising promotion which allowed customers to purchase 40-45% more photos at no increased price. Again, there was no increase in the lab work force. Plaintiff, along with others in his department and in management, had to continue to work Saturdays and Sundays to keep up with the increased workload. The increased workload forced Plaintiff to cancel his vacation.
5. Plaintiff and the members of his department continued to work increased hours and days, through the autumn of that year, and into the winter of 1994. Plaintiff's increased workload and increased production pressures over that 9-10 month period created an increase in stress for him.
6. Finally, on February 21, 1994, plaintiff became so dysfunctional he had to see his personal physician, Dr. John Sensenbrenner of Randolph Internal Medicine. Dr. Sensenbrenner diagnosed plaintiff as suffering from depressive anxiety, a stress-related disorder, causally related to his work stress and to his long hours at work. He felt that part of plaintiff's problem was his stress at work. He treated plaintiff for his depression and anxiety until March 29, 1994, when he wrote a disability note: "[Patient] seen today with further work related stress reaction causing depressive anxiety. He is not to return to work . . . ." Dr. Sensenbrenner testified that plaintiff's depressive anxiety was causally related to his work, that plaintiff was disabled from work, and that his depressive anxiety was directly related to the increased stress that he was having at work. He also testified that in his opinion, plaintiff's work conditions put plaintiff at an increased risk for developing and having depressive anxiety. On cross-examination, Dr. Sensenbrenner testified that he did not believe that any other physical problems (non-work related) placed stress on plaintiff or affected ability to work normally.
7. Dr. Sensenbrenner referred plaintiff to Dr. Scott Wallace, a board certified psychiatrist in Charlotte. Dr. Wallace diagnosed plaintiff as suffering from (1) a major depressive disorder and (2) a panic disorder with agoraphobia. Dr. Wallace testified that plaintiff's major depressive disorder was caused by stress at work and was complicated by his anxiety disorder. Plaintiff was disabled from May 1994 until his last visit, in February 1995. Dr. Wallace explained that plaintiff's stress at work overwhelmed him emotionally, resulting in his depression, which was the precipitating event of his disability. He further explained that plaintiff's depression was caused by a chemical imbalance in the brain, and that the stress at work caused the chemical imbalance, thus causing his depression. Dr. Wallace also testified that Mr. Meacham's job stressors (work load dramatically increased, fewer employees to perform greater workload, increased pressure to produce more, longer work hours, no vacation for several months) exposed him to a greater risk of developing a major depressive disorder than the population in general. On cross-examination, Dr. Wallace testified that plaintiff's major depressive episode in the 1960s was too remote to change his opinion that plaintiff's work stress precipitated his depression. Also on cross-examination, Dr. Wallace testified that it had long been accepted in the psychiatric and psychological communities that increased workload and increased hours would increase one's risk of developing major depressive disorder.
8. Plaintiff's disabling occupational disease was caused by job related stress, and the circumstances of his job and its requirements exposed him to a greater risk of developing the occupational disease that he has than members of the public generally from events of day to day life.
* * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. In order to establish that he suffers from an occupational disease plaintiff must prove that the disease is (1) characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be "a causal connection between the disease and the [employee's] employment." Rutledge v. TultexCorp., 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). The first two elements are met "if, as a matter of fact, the employment exposed the worker to a greater risk of contracting the disease than the public generally." Id. at 93-94, 301 S.E.2d at 365. The third is satisfied if the employment "significantly contributed to or was a significant causal factor in the disease's development. This is so even if other non-work-related factors also make significant contributions, or were significant causal factors." Id. at 101,301 S.E.2d at 369-70.
2. Plaintiff has met his burden of proof with respect to all three prongs of the Rutledge test.
3. Plaintiff is entitled to continuing medical compensation from February 21, 1994, for his occupational disease and disability compensation at the rate of $466 per week for all weeks that he was or is unable to work by reason of his occupational disease, beginning March 29, 1994.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of Deputy Commissioner Garner and enters the following:
AWARD
1. Defendant-employer shall pay for plaintiff's medical treatment resulting from his occupational disease and reasonable fees for the medical depositions if not heretofore paid.
2. Defendant-employer shall provide disability compensation of $466 per week for each week that plaintiff continues to remain unable to work by reason of his occupational disease, beginning March 29, 1994, and continuing until further orders of the Industrial Commission. Such compensation as has already accrued shall be paid in a lump sum, subject to the attorney's fee hereafter awarded.
3. Plaintiff's attorney is entitled to a reasonable fee of 25% of the disability compensation. One fourth of the lump sum payment ordered in the preceding paragraph shall be paid directly to such attorney and thereafter such attorney shall receive every fourth compensation check. Interest on the entire amount of the award shall be payable from 23 May 1995 (the date of the hearing before Deputy Commissioner Garner) until paid. The entire interest shall be paid to plaintiff.
4. Defendant-employer shall pay the costs.
 S/ ________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ________________________ BERNADINE S. BALLANCE COMMISSIONER
S/ ________________________ LAURA K. MAVRETIC COMMISSIONER